[No. 15452.   Department Two.   March 18, 1920.]

# J. A. COLEMAN, *Appellant,* v. ST. PAUL & TACOMA LUMBER COMPANY *et al., Respondents.*[1]

FRAUDS, STATUTE OF (37)—REQUISITES OF WRITING—STATEMENT OF TERMS. To satisfy the statute of frauds, the memorandum must in itself 'contain all the terms of the contract; and a contract partly in writing and partly in parol is an oral contract under the statute.

SAME (22)—SALE OF GOODS—CORPORATE STOCK. Corporate stock is goods, wares and merchandise, within the meaning of the statute of frauds.

CONTRACTS (7)—OFFER AND ACCEPTANCE—NEW PROPOSALS. An acceptance to constitute a binding contract must be as broad as the offer, and any conditions attached are in the nature of new proposals.

PLEADING (28-1)—COMPLAINT—DISTINCT COUNTS. Upon general demurrer to a complaint stating a single cause of action in different counts, the two statements must be considered together as one.

FRAUDS, STATUTE OF (27)—SALE OF GOODS—PART PAYMENT—EXPENSES. The payment of expenses in exploring property is not the giving of something in earnest, within the meaning of the statute of frauds, since it was not anything of value given to the other party.

CONTRACTS (6, 8) — OFFER AND ACCEPTANCE—PRELIMINARY LETTERS. Letters indicated a purpose to open negotiations which might lead to a contract, or settle the terms of a proposed agreement, and do not constitute an offer that could be turned into a binding obligation, where they refer to prior oral negotiations and matters unintelligible, and to liens to be dealt with before consummation of a sale, and to an option the terms of which were not fixed, and to a final agreement to be arranged later.

FRAUDS, STATUTE OF (37)—REQUISITES OF WRITING—STATEMENT OF TERMS—ORAL MODIFICATION. A written offer to sell mining stock was not accepted so as to bring it within the statute of frauds, where, upon a conference, it appeared that there were liens against the stock, and that the seller orally agreed to modify the agreement so as to permit the amount of the liens to be withheld; since the con-

[1]Reported in 188 Pac. 532.

tract would be partly in writing and partly in parol, and a modifica-
tion by parol would nullify the rule of the statute.

BROKERS (30)—ACTIONS FOR COMPENSATION—DEFENSES. Plaintiff,
a broker, cannot claim a breach of a contract to sell mining stock to
a purchaser that he might procure, nor recover damages, without
showing a binding obligatory promise by defendant to sell the stock,
where the contract did not provide that defendant should pay
plaintiff for his services.

Appeal from a judgment of the superior court for
Pierce county, Clifford, J., entered April 2, 1919, dis-
missing an action on contract, upon sustaining de-
murrers to the complaint. Affirmed.

*Hartman & Hartman,* for appellant.
*Ellis & Evans,* for respondents.

FULLERTON, J.—The appellant, plaintiff below, insti-
tuted this action against the respondents to recover the
sum of $25,000, alleged to have been lost to him because
of a breach of contract on the part of the respondents.
To his complaint, demurrers were interposed by the
several respondents, which the trial court sustained.
The appellant elected to stand on his complaint and
refused to plead further, whereupon a judgment of
dismissal was entered against him. The ultimate ques-
tion in this court, therefore, is does the complaint state
facts sufficient to constitute a cause of action.

The complaint was divided into two causes of
action. In the first, the appellant alleged, in para-
graph one thereof, that the respondent St. Paul &
Tacoma Lumber Company is a corporation of the state
of Washington; that the respondent Herbert S. Griggs
is the secretary of such corporation, and secretary of
a corporation known as the Pacific Coal & Lumber
Company, and agent of all of the respondents for the
sale of the shares of the capital stock of the Pacific

Coal & Lumber Company, as thereinafter set forth. In paragraph two of the complaint, John H. Scott and Jane Doe Scott are alleged to be husband and wife. Paragraph three of the complaint is as follows:

"That, on the 29th day of December, 1916, the defendant Herbert S. Griggs, acting personally for himself, and as the agent and authorized representative of the defendants St. Paul & Tacoma Lumber Company and John H. Scott and Jane Doe Scott, his wife, for the consideration therein stated, made a proposition, offer and agreement in writing to and with the said plaintiff, as follows, to wit:

" 'Herbert S. Griggs, Attorney-at-law,
" 'Fidelity Bldg.   Phone Main 1884.
        " 'Tacoma, Washington, December 29th, 1916.
" 'Mr. J. A. Coleman, Attorney at law,
" 'New York Bldg., Seattle, Wn.
        " 'Re: Pacific Coal & Lbr. Co. Stock.
" 'Dear Mr. Coleman:
        " 'As per my talk with you today, I saw Major Griggs, President of the St. Paul & Tacoma Lbr. Co., which company owns 501 shares of the 1,000 shares of the Pacific Coal & Lumber Company.  He said there was an option out on this stock that would expire on February 1st, and he was willing that your people should have ten days after February 1st, or after you had notice that this outstanding option no longer existed, within which to buy the stock at $200 per share. Mr. Scott and Mrs. Scott, who own 125 shares, will do the same.

" 'Mr. Howarth, who owns 125 shares, will do exactly as Major Griggs advises, and that he will put in his stock on that basis I feel confident.  I also feel certain that Mr. C. H. Jones, who owns 125 shares, will do the same, and that Mr. Hewitt, who owns an additional 124 shares, will fall in line if your people purchase the rest of the stock.

" 'In case your people decide to purchase the stock of the Lumber Company and Mr. Scott (which would give you control of the corporation), at least thirty

days' time must be given all other stockholders to put their stock in at the same basis, and the agreement would be that all stock offered within say thirty days must be taken. Mr. Scott and the Lumber Company have agreed that, in case your principals purchase their stock on the above basis, they will pay direct to you their pro rata proportion of a total attorney's fee of $5,000, to be paid to you when the present liens are all successfully defended and wiped out, for which purpose you will be employed as special counsel by the Pacific Coal & Lumber Company, and the other stockholders who come in will have to come in on the same basis.

" 'If you are satisfied to take a chance on the Steel Company's option falling through, and have your principals out here to make a personal examination of the property before February 1st, the final arrangements and final agreement can be arranged for and the deal concluded on the day following the expiration of the said option; and the understanding would be that, unless your principals are ready to sign up an option agreement on February 1st and pay $10,000 down on delivery of at least the majority of the stock in escrow, subject to the above conditions, no option will be granted and no allowances made for anything that you or your principals may have done prior to that time.                                 Very truly yours,
                              " 'Herbert S. Griggs.

" 'HSG:R
" 'P. S. The Lumber Co. will not renew or extend the Steel Co. option, except of course in case on or before Feb'y 1, 1917, they actually purchase the stock on satisfactory terms.                        H. S. G.'

"That, after receiving the proposition and agreement aforesaid, the said plaintiff placed the same before his principals referred to by the defendants as 'your people' and again as 'your principals' who with plaintiff, about the 19th day of January, 1917, called upon the said Herbert S. Griggs, at his office in Tacoma, Washington, for conference, acceptance, and arrangement for carrying out the details of the agreement and fully consummating the same according to

the terms thereof, and thereupon the said Herbert S. Griggs, for himself and those whom he represented, was informed of the object of the visit of the parties aforesaid, and their desires of obtaining the property according to the proposition and agreement made and their willingness to fully comply therewith, if the option referred to, which was held by one Henry Hewitt, Jr., was not exercised; and thereupon the said Griggs informed all the parties that the real estate of the Company, whose shares were to be sold and delivered, was encumbered with a lease to one Dr. Marcy, and with claims of liens for labor performed wherein $33,000 or thereabouts was claimed and suit was then pending for the enforcement thereof which was being contested by the owner of the property; and that the said principals aforesaid informed the said Griggs that they were quite willing to take the shares of the company agreed to be sold and purchased whose property was so affected, subject to the rights of the said Dr. Marcy, under his lease, but suggested that some protection ought to be had regarding the alleged liens for labor; and thereupon the said Griggs stated and agreed that he would modify the arrangement and agreement in that respect, so that the purchasers should pay all the consideration that might become due under the sale arrangement, excepting the sum of $35,000, which should be held back or placed in escrow as might suit the purchaser, until the liens were determined and, if determined adversely to the company, then the purchasers should pay the amount upon the lien judgment; and otherwise, the money should be paid forthwith to the seller under the arrangement aforesaid, and that the parties to the agreement and concerned then all expressed their willingness and readiness accordingly, and the agreement as modified became the full understanding between and among all the parties, save that the defendants through Herbert S. Griggs, their agent and representative, for the consideration therein stated, made further promises, agreements and representations for full consideration, with the plaintiff under a letter dated January 25th, 1917, as follows, to wit:

" 'Herbert S. Griggs, Attorney-at-law,
" 'Fidelity Bldg.   Phone Main 1884.
          " 'Tacoma, Washington, January 25th, 1917.
" 'Mr. J. A. Coleman, Attorney-at-Law,
" '306 New York Bldg., Seattle, Wn.
     " 'Re: Pacific Coal & Lbr. Co. Stock.
" 'Dear Mr. Coleman:
     " 'Thank you for yours of January 24th, and I hope
we can put a deal through with your clients on the
lines suggested.
     " 'With reference to what Shoudy said, I will talk
the matter over with Mr. Scott so that I can give you
a full report and will write you later.   At the present
time, my recollection is that Shoudy did not explain
just what his connection was.   He merely showed very
accurate information as to the details of the business—
told me, among other things, that he was so confident
that the Tungsten properties would pan out that he
himself had personally gone to quite a lot of expense;
that he bought one of the machines and put in some
additional improvements to the amount in all of some-
thing like $2,000, and that he was satisfied the enter-
prise would pay him.   He certainly did not limit his
interests on connection with the company in any way
whatever, but I must confess I did not understand that
he was anything more than the general manager at
Wilkeson.
     " 'I do not believe our people would feel, in any
event, like giving your people such a contract without
a payment down of at least $10,000 that would be for-
feited in case your people refused to make the pur-
chase; unless, of course, your investigation shows
from the engineer's reports that there are now about
thirty-five to forty-five million tons of coal available
as far as can be determined by careful prospecting.
                    "Very truly yours,
" 'HSG/R                          H. S. Griggs.'
"all of which were accepted and agreed to, relied and
acted upon by the said plaintiff and his said principals,
and at all times the said principals were ready and
willing to pay the entire consideration in cash for

shares that might be delivered save the amount to be held back."

In paragraph four it is alleged that the appellant, relying upon the promises and agreements set forth as aforesaid, continued his negotiations with his principals and with the respondents, and under the sanction, advice, and approval of the defendants, caused all of the properties of the Pacific Coal & Lumber Company to be fully and completely examined by competent engineers, paying for their services "out of his own pocket the sum of $400"; that his principals, being fully satisfied with the character and value of the property, consented to purchase the same on the terms proposed; that they called upon the respondent Griggs on February 1, 1917, to close the deal and thereupon offered to pay and were prepared to pay down the full amount in cash necessary to secure the shares according to the agreement, "excepting the $35,000 aforesaid," and did comply with the option agreement in all respects; that they were then informed by the respondent Griggs that the option agreement theretofore outstanding had been exercised, "and that because thereof the respondents were absolved and released from their agreement to sell as aforesaid, and not for any other reason than that the option had been exercised."

In paragraph five it is alleged that, long after his principals had abandoned the agreement to purchase the shares, the appellant was informed and learned that the respondents knowingly misrepresented the facts concerning the exercise of the prior option agreement, and if they had not so misrepresented such facts his principals would have purchased the shares of stock and fully carried out the agreement.

In paragraph six it is alleged that the appellant's principals had agreed to pay him for his services in

the premises the sum of $25,000 in the event that he procured the assent of the respondent to sell the shares of stock mentioned and the agreement should be carried into effect; further alleging that the compensation agreed to be paid him was fully earned, and would have been paid but for the fraudulent and false representations by means of which the respondent withdrew from the agreement of sale, and that, by reason thereof, he was damaged in the sum of $25,000.

In his second cause of action the appellant adopts by reference the first two paragraphs of his first cause of action. He then alleges that, on or about the 29th day of December, 1916, the respondent Griggs, acting for himself and as agent for the other respondents, entered into an oral agreement with him that, if the appellant would obtain a purchaser therefor and secure payment for his services from the parties willing to purchase, the respondents would sell to such parties 501 shares of Pacific Coal & Lumber Company owned by the respondent St. Paul & Tacoma Lumber Company, and 125 shares of such corporate stock owned by the respondents John H. Scott and wife, for $200 per share, providing an existing option in favor of Henry Hewitt, Jr., was not exercised prior to February 1, 1917, on which date it would expire, and providing further that the purchasers should be prepared to pay down $10,000, within ten days after the expiration of the Hewitt option to bind the bargain. That, to assist in carrying out said agreement, the defendant Herbert S. Griggs, as agent for defendants, executed and delivered on December 29, 1916, that certain option in writing referred to and set forth in the first cause of action in paragraph three thereof, which was thereupon accepted and acted upon by said purchasers as hereinafter set forth; that, long prior to the expiration of the Hewitt option, the appellant interested

prospective purchasers in the property, and arrangements were finally made whereby such purchasers agreed to purchase such shares in accordance with the terms of the option, and agreed with the appellant that, upon the consummation of the deal, they would pay the appellant the sum of $25,000 as his commission and compensation in obtaining the option and right to purchase, all of which was well known to the respondents prior to the occurrence of the matters thereinafter referred to. Paragraphs two and three, which conclude the complaint, contain, in substance, the matters set forth in the like numbered paragraphs of the first cause of action. The demand of the complaint is for judgment against each and all of the respondents for the sum of $25,000 and the costs of the action.

The demurrers were based upon the several statutory grounds, and upon a ground distinctly specified founded upon § 5290 of the code (Rem.) commonly known as the statute of frauds; a ground probably included within the general statutory ground previously set forth, namely, that the complaint does not state facts sufficient to constitute a cause of action. The order sustaining the demurrers was general and does not disclose upon which of the grounds it was rested, nor whether upon more than one; nor does the record elsewhere give us any light upon the question. We shall therefore notice only the questions suggested in the briefs.

But before passing to the specific questions, it is well to call to mind certain preliminary matters necessarily involved therein and over which there can be no serious dispute. The statute cited as forming the basis of the specific cause of demurrer provides that no contract for the sale of any goods, wares, or merchandise for the price of fifty dollars or more, shall be good and valid, unless the purchaser shall accept and

receive part of the goods so sold, or shall give something in earnest to bind the bargain, or in part payment, or unless some note or memorandum in writing of the bargain be made and signed by the party to be charged thereby, or by some person thereunto by him lawfully authorized. Under this statute, we have held that the writing, when alone relied upon to relieve from the bar of the statute, must in itself contain all of the terms of the contract. While we have said that the writing need not be formal and may contain implied conditions and may use trade terms or abbreviations requiring explanation, without subjecting it to the fault of incompleteness, yet it must be so far complete in itself, after effect is given to the implied conditions and the trade terms and abbreviations are explained, as to show the bargain made. *Nut House v. Pacific Oil Mills,* 102 Wash. 114, 172 Pac. 841; *Wright v. Seattle Grocery Co.,* 105 Wash. 383, 177 Pac. 818. We have held, also, in a case where the specific question was raised, that capital stock of a corporation was goods, wares or merchandise within the meaning of the statute. *Hewson v. Peterman Mfg. Co.,* 76 Wash. 600, 136 Pac. 1158, Ann. Cas. 1915D 346, 51 L. R. A. (N. S.) 398.

Again, it is the rule that, where the contract is alleged to consist, as it is in this instance, of an offer on the one side and the acceptance of the offer on the other, the acceptance, to constitute a binding contract, must be as broad as the offer, any conditions attached to the offer being in the nature of new proposals, which themselves must be accepted to make a binding contract. *Olympian-Tribune Pub. Co. v. Byrne,* 28 Wash. 79, 68 Pac. 335; *Bringham v. American Bridge Co.,* 39 Wash. 3, 80 Pac. 788; *Littell v. Saulsberry,* 40 Wash. 550, 82 Pac. 909; *Sillman v. Spokane Sav. & Loan Co.,* 103 Wash. 619, 175 Pac. 296.

Another matter also deserves notice: While the appellant has stated his cause of complaint as if he had two causes of action, it is at once apparent that he has but one. Each of the purported causes of action is founded upon the same transaction and, instead of being a statement of separate causes of action, it is a statement of a single cause of action in different forms or counts. This was familiar practice at the common law, but it has no sanction in the procedure as prescribed by the code. Indeed, we have heretofore condemned it. *Gabrielson v. Hague Box & Lumber Co.,* 55 Wash. 342, 104 Pac. 635, 133 Am. St. 1032. Since, however, the objection to the complaint was taken by demurrer, the question of its defect in this respect is not before us. But it does not follow that we must regard the complaint as stating two causes of action. On the contrary, the two separate statements must be construed as one, and from the whole it must be ascertained whether a cause of action is stated.

Turning to the more specific questions, it is at once apparent that the contract on which the action is founded is one, that, to escape the inhibition of the statute cited, must be evidenced by a note or memorandum in writing. The value of the property was more than fifty dollars and there was no delivery of any part of the property, and nothing given in earnest to bind the bargain nor in part payment. True, the appellant contends that the sum expended by him in exploring the property amounted to the giving of something in earnest, but plainly this is not the meaning of the statute. It is obviously contemplated that something of value shall pass to the promisee, something given to and received by him towards payment; acts merely preliminary, or ancillary to the agreement, such as investigations of the property, are not sufficient. *Hewson v. Peterman Mfg. Co.,* 76 Wash. 600,

136 Pac. 1158, Ann. Cas. 1915D 346, 51 L. R. A. (N. S.) 398. The appellant's investigations, however expensive they may have been to him, could in no sense be anything of value given to the other parties.

The only writings pleaded are the letters of the defendant Griggs, set out in full in the complaint. These of themselves do not, of course, constitute a contract. Being unilateral, and supported by no independent consideration, they are, at best, nothing more than offers which may by acceptance ripen into a contract. But we think it plain that they are not even offers capable of becoming a binding obligation by mere acceptance. Whether a writing of this sort will constitute a definite offer which the other party may turn into an obligation by acceptance, depends upon the intent and purpose of the writer. This intent and purpose, it is true, must be gathered from the writing itself and the surrounding circumstances and conditions, rather than from the subsequent declarations of the writer; yet, where these indicate that it was the purpose of the writer to open negotiations which might possibly lead to a contract, or to settle the terms of a proposed agreement already under consideration into which he purposes to enter after all the particulars are adjusted, the writing will not constitute a binding offer. These letters are of the latter sort. To us they indicate, when taken with what is alleged concerning the surrounding conditions, that they were a part of certain general negotiations looking to the sale of the property, and not a fixing of definite conditions upon which the parties obligated themselves to sell. The first of them shows on its face that there had been prior oral negotiations, and it contains references and statements to matters of detail which must have been unintelligible, even to the receiver, were he not aided by the previous negotiations. It indicates that there

were liens upon the corporate property which were necessary to be dealt with before the sales of the shares were consummated, yet the letter, while it mentions the payment of an attorney's fee in case the liens are successfully defended, contains no reference as to their disposition, should the defense prove unsuccessful. Again, it mentions an option to be granted the appellant's principals after the termination of the existing option to other parties, yet it does not state the terms or conditions of the option to be granted, even in general terms.  It recites, also, that the "final arrangements and final agreement can be arranged for and the deal concluded on the day following the expiration of the existing option." Thus, rather than being a definite proposition containing all of the conditions of the proposed sale, it bears evidence that further negotiations were contemplated; evidence that it was but one of the steps in the general negotiations, looking to the sale of the property.

The second letter is likewise inconclusive.  It discloses on its face that it was an answer to a communication made by the appellant evidently inquiring concerning the apparent interest of another in the property of the corporation, and apparently objecting to the option payment suggested in the first letter.  As to the first, the writer promises to make inquiry, although stating that his understanding of the other's interests was not in accord with his claims as reported. He also refuses to recede from the requirement of an option payment and its forfeiture if the option is not exercised, unless the coal in the mine apparently available does not equal a given quantity.  More plainly than the first, we think, it shows that the letters were a part of general negotiations looking toward a sale of the property than definite propositions fixing all of the terms of the contemplated sale.

The courts have always been slow, under circumstances such as are here shown, to construe the writing of the parties as definite offers. As was said by a noted English judge: "On a question of construction, different minds may differ, but, for my own part, I have often felt that in cases of this nature parties have found themselves entrapped into contracts by letters which they wrote without the slightest idea that they were contracting." *Rossiter v. Miller*, 5 Ch. D. 648. And so Mr. Elliott in his work on Contracts, Vol. 1, p. 29, § 27, says:

"Likewise, great care should also be taken not to construe the conduct, declarations or letters of a party as proposals when they are intended only as preliminary negotiations. The question in such cases is, did the offerer mean to submit a proposition, or was he only settling the terms of an agreement on which he proposed to enter, after all its particulars are adjusted? If it is intended merely to start negotiations which may subsequently result in a contract, or is intended to call forth an offer from the one to whom it is addressed, its acceptance does not consummate a contract. The fact that the parties do intend a subsequent agreement to be made is strong evidence to show that they do not intend the previous negotiations to amount to any proposal or acceptance. An agreement, to be finally settled, must comprise all the terms which the parties intended to introduce into the agreement and until the terms of a proposal are settled, the proposer is at liberty to retire from the bargain."

But if it were conceded that the terms of the offer were sufficiently definite, the complaint plainly shows there was no acceptance of the offers as contained in the letters. There was a further oral contract materially modifying the terms of the offer. In the paragraph of the complaint which we have quoted in full, it is recited that, when the appellant appeared with his principals, for conference, acceptance and arrange-

ment for carrying out the details of the agreement, the writer of the letters informed them that the corporate property was encumbered with a lease, and that there were labor liens against it aggregating some $33,000,

"And thereupon said Griggs stated and agreed that he would modify the arrangement and agreement in that respect, so that the purchasers should pay all the consideration that might become due under the sale arrangement, excepting the sum of $35,000, which should be held back or placed in escrow, as might suit the purchaser, until the liens were determined . . ."

This was a material modification of the writing. It shows that the final contract was partly in writing and partly in parol, which, under the statute of frauds, is an oral contract. *Crouch v. Forbes,* 63 Wash. 564, 116 Pac. 14; *Cushing v. Monarch Timber Co.,* 75 Wash. 678, 135 Pac. 660, Ann. Cas. 1914C 1239; *Campbell v. Weston Basket & Barrel Co.,* 87 Wash. 73, 151 Pac. 103. In the language of *Cushing v. Monarch Timber Co., supra:*

"By an unbroken line of decisions we have held that, to meet this statute, the writing evidencing the agreement must be so complete in itself as to make a resort to parol evidence to establish any material element of the agreement unnecessary. The rule deduced from prior decisions and tersely expressed in *Engleson v. Port Crescent Shingle Co., supra,* is that: 'A writing sufficient to satisfy the statute must be coextensive with the stipulation of the parties; that is to say, it must express the entire contract and leave nothing that pertains to the essentials of the contract to be supplied by parol.'"

The appellant contends, citing cases maintaining the contention, that a contract within the statutes of frauds—that is, one that is required by such statutes to be evidenced or proved by a writing—can be modified or added to by a subsequent parol agreement without

violating the rule of the statute. But, without entering upon a review of the cases, we think the weight of authority is to the contrary, and that such is the effect of the cases from this court last above cited. The controlling principles as we understand them are tersely stated in *Abell v. Munson*, 18 Mich. 306, in the following language:

"The statute of frauds requires every contract for the sale of lands to be in writing, and signed by the party making the sale. . . . The rule prohibits any enforcement of parol contracts; and while written contracts, which would have been lawful if unwritten, may be modified by parol, subsequently, in many cases, yet this cannot be done where the law requires the agreement to be in writing."

The appellant also points to the allegation in the second count of his complaint, wherein it is alleged that the defendants entered into an oral contract with him to the effect that, if he would proceed to find a purchaser for the stock and obtain payment for his services from the parties willing to purchase, they would sell the stock to such purchaser at a named price per share, and argues therefrom that this is a contract of employment not within the statute of frauds, and that, since he procured a purchaser ready and willing to take the property on the terms proposed, he has complied with his agreement and is entitled to recover any damages sustained by him by reason of the breach of the contract. Doubtless had the respondents agreed with the appellant to pay him the commission for which he sues, if he procured a purchaser for their stock at the price named, he could recover against them should he procure a purchaser ready, able, and willing to take the stock at the agreed price, whether the sale was actually made or not. But it is at once manifest that the case supposed rests on a principle

different from the principle in the case before us. There he would recover because of the direct promises to pay made to him for the performance of a stated service. But in the case before us, the respondents promised to pay him nothing. All they agreed to do was to sell the stock to a purchaser he might procure. He recovers, if he recover at all, not upon any direct promise to him but upon a breach of the promise to sell which operated to his damage. Clearly he must show, before he can urge a breach, a valid and subsisting promise to sell obligatory upon the respondents. In other words, the appellant's right of recovery turns on the question whether there was an obligatory contract to sell the stock, not on the question whether he procured a purchaser ready, able and willing to purchase the property.

There is nothing in the cases of *Barnes v. German Savings & Loan Soc.,* 21 Wash. 448, 58 Pac. 569; *Livermore v. Crane,* 26 Wash. 529, 67 Pac. 221, 57 L. R. A. 401, or *Littlefield v. Bowen,* 90 Wash. 286, 155 Pac. 1053, Ann. Cas. 1918B 177, that is contrary to the principle we here announce. The first was an ordinary action to recover commissions which defendant agreed to pay the plaintiff upon the plaintiff's finding a purchaser for his property. The other cases are like the present in that the broker sought to recover in damages as for a breach of contract from the party committing the breach, who was not the party promising to pay the commissions. But they differ from the present in that, in the one, there was an enforcible contract entered into between the seller and purchaser; and in the other, an enforcible contract in which the parties agreed to exchange properties. In the present case, there was no enforcible contract to sell and buy. The allegations of the complaint are no more, in substance, than would be an allegation that the respond-

ents employed the appellant to procure a purchaser for the property and obtain his commissions from the purchaser, but made no promise to sell the property in the case a purchaser should be procured. Plainly such an employment cannot give rise to a cause of action for the commissions agreed to be paid by the purchaser found by the employer, whatever the rule may be as to an implied promise to pay the reasonable value of the services.

Our conclusion is that the judgment should stand affirmed, and it is so ordered.

HOLCOMB, C. J., BRIDGES, and TOLMAN, JJ., concur.