[No. 27278. Department Two. November 10, 1938.]

PACIFIC FOOD PRODUCTS COMPANY, *Appellant,* v. B. D. MUKAI *et al., Respondents.*[1]

*Shorett, Shorett & Taylor,* for appellant.

*Tucker & Tucker,* for respondents.

MILLARD, J.—This action was brought by a domestic corporation, as the buyer, to recover for alleged breach by the sellers, a copartnership, of a contract of sale of strawberries. At the conclusion of plaintiff's case, defendants' motion for dismissal was granted on the ground of failure of proof of a contract. Plaintiff appealed from the judgment dismissing the action.

Counsel for appellant contend that a memorandum, prepared by a broker acting for the respondents, em-

[1]Reported in 84 P. (2d) 131.

bodying all the conditions of the sale, constituted a binding contract. However, it is urged, if the sales memorandum is not a contract, the formal contract prepared by respondents and signed by appellant but not signed by respondents is an enforcible contract between the parties. That is, the sales memorandum is an enforcible agreement, which is still in effect unless superseded by the "cold-pack" contract, which is binding.

Counsel for respondents argue that the sales memorandum did not constitute a binding contract, but was a preliminary to a subsequent formal contract (which was not valid until signed by both parties) of purchase the parties intended to make, which formal contract was never executed.

The facts are summarized as follows:

Respondents, a copartnership, are engaged in the business of growing and packing strawberries, which are sold under three different grades: "Field run," which are those without grade in size; "sort outs," which are the culls picked from the "field run;" and "selected berries," which are graded and sized.

Appellant is engaged in the business of preserving berries and preparing other types of food for market. The William McBride Company, of which William McBride is the head, is engaged in the brokerage business and prior to this controversy sold berries for respondents.

Respondents' 1936 crop, estimated to aggregate fifteen hundred barrels of berries, was listed by respondents with McBride and other brokers to sell on a commission basis.

Prior dealings in 1935 of appellant with respondents through McBride resulted in the execution by the parties of a formal Northwest Fruit Barrelers' Association "cold-pack" form of written contract, which

was performed by both parties. McBride negotiated another contract in 1936 between appellant and respondents. After McBride's conversations with the parties, he issued his sales memorandum, which contained McBride's understanding of the general arrangements, following which respondents and appellant again executed a formal Northwest Barrelers' Association "cold-pack" form of written contract, referred to as the "sort-out" contract. A dispute, which was finally settled and the contract performed, arose between the broker and respondents concerning this contract, which is not the one in controversy. Respondents were apprehensive that the broker's permission to appellant to retain the contract, which the respondents had signed, without completion and return of the contract promptly to respondents, afforded to appellant buyer an opportunity to take undue advantage of market conditions—fluctuating prices.

During that dispute, McBride negotiated the deal in controversy in the action now before us. McBride obtained by telephone information from appellant as to what that buyer desired to purchase, and from respondents information as to what they would sell. Respondents offered 170 barrels of 3x1 Graded Marshall strawberries, size one inch to one and one-fourth inches, at seven and one-fourth cents a pound. Appellant accepted that offer June 16, 1936, on which date McBride prepared and mailed to appellant and to respondents his sales memorandum, reading as follows:

"SALES MEMORANDUM

Seattle, Wash., June 16, 1936

Seller Confirms Sale as Follows:

Sold to Pacific Food Products Co., 2040 Weller St., Seattle, Wash.

For Account of Mukai Packing Co. Address: Vashon Island, Wash.

(F.O.B.) Warehouse Seattle Pack of 1936
Terms (Same as 1935 sale to Pacific) Shipment Same as
Routing                    1935 shipment.
Labels                               Label Allowance
Remarks:   Mr. Mukai:  see last years
            contract that you have        Brokerage 4%
Quantity  Size                   Commodity        Price Per
170 bbls. 50 gal. 3 x 1 Graded Marshal Straw-
        berries 1″ to 1-¼″ in size          7-¼c  lb.
If there are any corrections in the above please notify
us immediately.  This memo becomes void when sale
is covered by contract.

                           Wm. W. McBride Co.
                           (Signed) By Wm. McB."

Later that same day, after McBride mailed the memorandum, respondents advised McBride by telephone that they desired to change the size of the berries to include also berries five-eighths inch to one inch. Appellant by telephone consented to this modification; however, McBride did not issue a new memorandum embodying this change. On June 16, 1936, prior, however, to receipt of the sales memorandum prepared by McBride, respondents filled out, but did not sign, a Northwest Fruit Barrelers' Association "cold-pack" form of written contract, which is the same form of contract called for by the sales memorandum and the same form used by the parties and the broker in their prior transactions. That contract provides that it shall not be binding upon seller until signed by the buyer. These unsigned contracts, describing the berries as one inch to one and one-fourth inches graded or five-eighths inch to one inch, were sent in triplicate to McBride and received by him June 17th, the following day. The sales memorandum prepared by McBride was received by respondents June 17th, and they immediately—having learned that their strawberry pack was running short—telephoned McBride to cancel the

contract. Mukai testified: "I told Mr. McBride to tear up those contracts—I told him I couldn't take any more orders and to cancel that and tear up the contract."

On June 22, 1936, the respondents wrote to McBride as follows:

"As to the 170 barrels of graded berries, as I told you today, please do not do anything until you hear from us. In the meantime, I hope you will try to get strawberries for Mr. Firnstahl [president of appellant company] from another packer. My pack is falling down to 60%, and I am sure that I am not able to take care of this order."

In due course of mail, this letter was received by McBride, who, on June 24th, wrote to the respondents enclosing the "cold-pack forms" of contract on the 170 bbl. transaction with the signature of appellant's president affixed. These were still unsigned by respondents. In that letter, McBride stated: "It was most difficult for us to withhold the contract after confirming, particularly as he insisted on signing it."

That language applied to the contract in controversy and is consistent with the testimony of the appellant's president that he received the contract from McBride for signature about a week subsequent to his receipt of the sales memorandum; that is, about June 24th, or two days after respondent's letter to McBride. McBride testified that, during this time, appellant's president was insisting on getting this contract for signature. McBride was apprised by respondent's letter of June 2nd that he was not to permit the formal contract to be submitted to appellant. Under date of June 26th, respondents replied to McBride's letter of June 24th and condemned as unethical McBride's act of procuring the signature of appellant's president to the contract after having been instructed not to do so. In that letter, respondents stated: "It is

apparent that Firnstahl signed the contract after I told you to return the same to us—this is also bad practice."

Under date of June 30th, 1936, McBride replied to respondents' letter of June 26th and admitted, in effect, as follows, that he had instructions prior to receipt of the letter of June 22nd not to permit the appellant to sign the contract.

"You refer to being unethical. Mr. B. D. Mukai was in the office after he confirmed and had our report of sale covering the graded Marshalls, and he asked us not to have Mr. Firnstahl sign this contract for a while. Naturally, he had his own reasons for wishing to reject his original confirmation at that time."

The trial court was convinced by the letters and the testimony of McBride that McBride obtained appellant's signature to the contract after he was advised that respondents had repudiated the entire transaction. The trial court was also convinced, despite the denials of appellant's president, that he knew all the time that respondents had repudiated the transaction; the court said: "I have not the slightest doubt in the world that Mr. Firnstahl knew about the situation."

Appellant's president testified that, from the beginning of the transaction and at all stages of the negotiations, the appellant was looking to broker McBride to take care of the appellant's interests.

The respondents did not believe they had entered into a completed contract, and when the copies of the contract bearing the signature of appellant were received by them, they placed those copies in their file. Just when, after the latter part of June, when appellant signed the contract and returned same to McBride to return to respondent, the appellant began to insist that McBride do something to obtain return of the con-

tract form with respondents' signature thereon, is not clear. Under date of July 29, 1936, McBride, on behalf of appellant, wrote to respondents, insisting on performance of a contract "of June 16th, which contract the buyer signed and which we forwarded to you under date of June 24th."

■■ It is clear that the sales memorandum was never intended to be the contract of the parties. On its face, it discloses that it was only to be a preliminary. "Terms (same as 1935 sale to Pacific), shipment same as 1935 shipment," and in "Remarks," the broker's direction "Mr. Mukai: see last years contract that you have," contemplate something else was to follow the sales memorandum to make it a contract. The further provision, "This memo becomes void when sale is covered by contract," read with the other quoted portion of the memorandum, evince the purpose of the parties. They contemplated that this was to be a contract like the one last year—that was a written contract—and when that contract is placed in writing and signed by the parties, the sales memorandum is void; it has served its purpose.

The written form of contract prepared by respondents reciting that the goods specified in the contract "on reverse side" is the contract the parties contemplated when the sales memorandum was made. That contract recited that "This contract shall not be binding upon seller until signed by" both parties. That form, unsigned, was sent by respondents to McBride, the broker, June 17th. On or before June 22nd, prior to receipt of that form by appellant, McBride was instructed by respondents to destroy the copies of the proposed contract, as respondents could not make delivery. No contract between the parties was then in force. Appellant could, as could respondents, then

withdraw. Until it became a binding contract, either could withdraw.

The signature of appellant obtained by McBride, under all the circumstances recited, amounts to nothing. McBride had no authority to obtain that signature, and appellant's president knew, we are convinced, that respondents had instructed McBride not to permit appellant to sign. In his letter of June 24th, in which McBride is endeavoring to construe the sales memorandum as a contract, which on the facts it is clear McBride never thought it was, and excuse his disregard of respondents' instructions, McBride says: "It was most difficult for us to withhold the contract after confirming, particularly as he insisted on signing."

In the letter of McBride July 29th to respondents, he again endeavors to excuse his conduct by saying that the sale was effected by the sales memorandum: "This was covered by your contract of June 16th." He was still insisting that the sales memorandum was a contract, which it is manifest, as stated above, was never intended to be the contract of the parties.

If the sales memorandum is not a contract—and we hold that it is not—no contract has been executed by the parties. Both parties contemplated the agreement was to be in writing, and the writing, it was agreed, was to contain all of the terms. A definite term or condition of the writing was that, until signed by both parties, the written form did not constitute a binding contract. Respondents never signed the form of contract. The signature of appellant alone is not sufficient to make the writing a binding contract. The conditions prerequisite to a contract binding upon the respondents and the seller were never satisfied.

In *Parks v. Kirkland Packing Co.*, 172 Wash. 450, 20 P. (2d) 588, after preliminary negotiations between

a prospective seller and buyer through a broker, the broker issued a sales memorandum similar in form to the one in the case at bar and mailed copy of same to the seller and a copy to the buyer. The formal "cold-pack" contracts for the signatures of the parties were prepared by the broker, who mailed same, together with the sales memorandum, to the seller for signature. The seller returned the contracts, unsigned, to the broker with the advice that it, in common with other packers, refused to sign contracts before the contracts were signed by the buyer. The broker forwarded the formal contracts to the buyer with the information that the seller insisted on the buyer signing the contracts before same were signed by the seller. Subsequently (a month after receipt of the contracts), the buyer executed the contracts and returned them to the broker but the seller repudiated the contracts and never accepted or signed them. The buyer sued the seller for damages alleged to have been sustained as the result of the seller's refusal to deliver the fruit. In affirming the judgment dismissing the action, we said:

"Assuming that, under certain circumstances, an agent, in the position occupied by Paup, could bind by such a sales memorandum as is hereinabove referred to, a principal such as is respondent here, the record in this case clearly discloses that no such authority existed in the case at bar. In its letter of May 24, Paup requested respondent to sign and return the formal contract. By its letter of the next day, respondent refused to do this, forwarding the proposed contract, but insisting that the buyer sign first. The contract was then by Paup promptly mailed to Von Kesler, and an ample opportunity was afforded the buyer to execute the same. This it failed to do, apparently preferring to wait until it could tell whether or not the market price of strawberries would rise or fall. It is evident that the buyer took no steps to close the deal until the

season for strawberries was well along, when it sought to avail itself of the proposed contract, it appearing that the price of the fruit had risen.

"It is clear that it was understood by all of the parties that the sales memorandum did not constitute the contract, but that respondent was insisting upon the execution by the buyer of a formal contract of purchase. In its letter of June 25, returning the contract signed by Luick Co., Von Kesler says: 'In view of the fact that the document is not signed by the packer, we are returning same for completion.' By the paragraph above quoted from Paup's letter of May 27 to Von Kesler, respondent's position in regard to this contract had been fully explained.

"In the case of *Coleman v. St. Paul & Tacoma Lumber Co.*, 110 Wash. 259, 272, 188 Pac. 532, this court quoted from 1 Elliott on Contracts, page 29, § 27, including the following text:

" 'The fact that the parties do intend a subsequent agreement to be made is strong evidence to show that they do not intend the previous negotiations to amount to any proposal or acceptance.'

"We are satisfied that, while the parties to this transaction contemplated a purchase and sale of strawberries, no binding contract was ever entered into between them, and the trial court did not err in dismissing the action on respondent's motion."

In that case, as in the case at bar, it was understood by all of the parties that the sales memorandum did not constitute the contract. On principle, and in practically all respects on the facts, *Parks v. Kirkland Packing Co.*, *supra*, is not distinguishable from the case at bar.

*Wright v. Seattle Grocery Co.*, 105 Wash. 383, 177 Pac. 818, cited by appellant, is distinguishable from the case at bar. In that case, all of the terms and conditions were contained in the instrument evidencing the transaction—that instrument showed a complete contract and satisfied the statute of frauds, although the time and place of delivery were not given.

*Cole-McIntyre-Norfleet Co. v. Holloway,* 141 Tenn. 679, 214 S. W. 817, 7 A. L. R. 1683, and *Hendrickson v. International Harvester Co.,* 100 Vt. 161, 135 Atl. 702, cited by appellant, are cases where the drummer, agent, or other employee of the principal solicited orders for goods of the principal, which orders were taken subject to approval of the principal. In the first case cited, the court held that orders solicited by drummers for wholesaler are not binding until accepted by the wholesaler; yet, if the wholesaler desires to reject such orders, he should, especially in cases of orders for perishable articles, notify the customer within a reasonable time that the order is not accepted; and, if with ample opportunity he fails to do so, silence for an unreasonable length of time will amount to acceptance if the customer is relying on him for the goods. In the second case, it was held that, where a principal sends an agent to solicit orders for his goods subject to approval, such principal must signify rejection to the customer within a reasonable length of time from receipt of the order; though, ordinarily, one need do nothing if not desiring to accept the proposition.

In the case at bar, there was not a misleading of the prospective purchaser, as in the two cases just cited. It was understood by respondents and appellant that the sales memorandum did not constitute the contract, but that a formal contract of purchase—not valid until signed by both parties—was to be executed. The subsequent contract contemplated by the parties was never executed.

The judgment is affirmed.

STEINERT, C. J., BEALS, GERAGHTY, and SIMPSON, JJ., concur.